**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| MARC DORSEY, | : | |
| Plaintiff, | : | Civil Action No. 06-2940 (JAG) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| BLACK PEARL BOOKS, INC., FELICIA | : | |
| HURST and DAMION MILLER, | : | |
| | : | |
| Defendants. | : | |

**GREENAWAY, JR., U.S.D.J.**

On June 28, 2006, Plaintiff Marc Dorsey initiated the instant action against Defendants, asserting causes of action for: (1) false designation of origin and false endorsement in violation of § 43(a) of the Lanham Act; (2) misappropriation / violation of right to publicity; (3) false light invasion of privacy; (4) defamation; (5) unfair competition; (6) unjust enrichment; (7) breach of contract; and (8) breach of implied covenant of good faith and fair dealing.

This matter comes before this Court on Plaintiff's motion for a preliminary injunction against Defendants Black Pearl Books, Inc. ("Black Pearl") and Felicia Hurst,[1] pursuant to his claims under the Lanham Act and New Jersey common law governing the torts of misappropriation and the right to publicity.  Plaintiff specifically seeks an order directing:

1. That the Black Pearl Defendants, their directors and officers, agents, servants, employees, attorneys, distributors, representatives and assigns, and all other persons in active concert or privity or in participation with

---

[1]Felicia Hurst is the owner and operator of Black Pearl.

1

them, be and hereby are preliminarily, and for the duration of this Action, enjoined from directly or indirectly using Mr. Dorsey's image in connection with the book <u>Legit Baller</u> ("the Book") and the advertising and promotion of the same, including but not limited to use on the Internet, or continuing to market, offer, sell, dispose of, display, publish, distribute, license, transfer, advertise, market, promote, develop, manufacture or otherwise exploit the Book, or any other books, goods or materials containing Mr. Dorsey's image, or to participate or assist in such activity;

2.    That the Black Pearl Defendants, their directors and officers, agents, servants, employees, attorneys, distributors, representatives and assigns, and all other persons in active concert or privity or in participation with them, be and hereby are directed to recall all copies of the Book, and any other book, goods or materials containing Mr. Dorsey's image, from all commercial and retail outlets and bookstores (including without limitation, Wal-Mart, Borders, Walden Books, B. Dalton, Barnes & Noble, Amazon.com), and all outlets offering such books for sale on the Internet, and any other place or person to whom they have caused books bearing or including images of plaintiff to be distributed for sale;

3.    That the Black Pearl Defendants be and hereby are preliminarily, and for the duration of this Action, enjoined and required to deliver upon oath, for destruction pursuant to judgment herein, all originals, copies, facsimiles, or duplicates of the Book, and any other book, advertising material, promotional material or other materials bearing plaintiff's image in their possession, custody or control, and to set out all other such measures as they have taken to comply with this Preliminary Injunction Order.

(Proposed Order at 2-3.) For the reasons set forth below, Plaintiff's motion will be granted in

part and denied in part.[2]

---

[2]This Court notes that before Defendants' counsel made an appearance in this matter, Defendant Hurst attempted to make an appearance on behalf of Black Pearl through a letter composed in response to Plaintiff's motion (she made no appearance on her own behalf). A corporation such as Black Pearl must be represented by counsel, and may not be represented by an individual acting *pro se* on its behalf. <u>See</u> <u>Simbraw, Inc. v. United States</u>, 367 F.2d 373, 337-47 (3d Cir. 1966) (holding that a corporation may not be represented by its president in court but was required to employ an attorney at law to appear for it and represent it in the litigation); <u>Pa. Bus. Bank v. Biz Bank Corp.</u>, 330 F. Supp.2d 511, 513 (E.D. Pa. 2004) (corporation may not appear *pro se* and may not be represented by anyone other than licensed counsel). This Court has the authority to strike any filings made by a non-attorney on behalf of a defendant corporation. <u>See</u> <u>Donovan v. Road Rangers Country Junction, Inc.</u>, 736 F.2d 1004, 1005 (5th Cir. 1984) ("Gordon declined to hire counsel to represent the corporation so the district court properly

# I. FACTUAL BACKGROUND

## A. Plaintiff's Accomplishments And Celebrity

### 1. Work And Accomplishments In The Music Industry

Plaintiff is a two-time Grammy nominated R&B singer, songwriter, and producer. (Dorsey Aff., ¶ 13.)  In 2003, Plaintiff released an album entitled Crave, which bore his photograph on the album cover.  Crave sold over 400,000 copies.  The title song on the album, "Crave," is also featured on the soundtrack of the film, The Wood, which sold more than 2 million copies.  (Id.)  Plaintiff's work has also appeared on other feature film soundtracks, including those for the Spike Lee films Crooklyn, Clockers, and Get on the Bus.  (Id.)

Plaintiff has also collaborated with other popular music artists, including Jay-Z, LL Cool J, Chaka Khan, Branford Marsalis, Charlie Wilson, Omar Hakim, Faith Evans, Carl Thomas, Will Downing, Kelis, and N.E.R.D.  (Id., ¶ 14.)  Taking into account Plaintiff's albums, singles, and collaborations, Plaintiff has been involved in the sale of over 10 million record copies.  (Id.)  Plaintiff has also been retained to provide his musical talents to Fortune 500 companies, including Sears, Toys R Us, and Coca Cola.  (Id.)  A recent search for "Marc Dorsey" on the Internet site Google returned more than 30,000 hits.  (Id., ¶ 15, Exh. A, Google "Marc Dorsey" search.)

---

struck the defenses of the corporation"); Laborers' Dist. Council Const. Industry Pension Fund v. Compliance Mgmt. Group, Inc., No. Civ.A. 04-4024, 2005 WL 1331059, at *1 (E.D. Pa. May 31, 2005) (ordering that any filing made by an individual on behalf of the defendant corporation be stricken); Liberty Mut. Ins. Co. v. Hurricane Logistics Co., 216 F.R.D. 14, 16 (D.D.C. 2003) (ruling that a corporation may not appear in court pro se, and if a corporation does not retain counsel, the district court may strike the corporation's answers and responses).  Here, Hurst, as a non-lawyer, cannot appear on behalf of Black Pearl.  Therefore, her letter to this Court does not constitute a proper appearance or response by Black Pearl, and is hereby stricken from the record. See, e.g., Donovan, 736 F.2d at 1005; Compliance Mgmt., 2005 WL 1331059, at *1.

As of the time the instant motion was filed, Plaintiff had derived approximately $200,000 - $300,000 in income from product endorsements using his voice. Plaintiff also earned over $1 million by associating his name and musical talent with film soundtracks and work by other recording artists. (Id., ¶ 17.) Plaintiff has, however, never authorized the use of his image to endorse or sell a product. (Id.)

### 2. *Philanthropic Activities*

In addition to his activities as a singer, songwriter, and music producer, Plaintiff is involved in philanthropic work on behalf of the African-American community. For instance, in 2005, Plaintiff founded the Dorsey Enrichment Program to help keep children in urban communities off of the streets and away from drugs. Plaintiff's Enrichment Program aims to provide vocational training to out-of-school inner city youths, so that they have an alternative to dangerous and illegal street activities. (Id., ¶ 18.)

Plaintiff is also involved in other community outreach programs sponsored by the City of Hackensack and the American Diabetes Association ("ADA"). On behalf of the ADA, Plaintiff wrote, produced, and sang on an educational video that will purportedly be distributed throughout the United States. Plaintiff's photograph is also scheduled to be featured on the ADA's website's "Celebrity Corner," alongside actor Ossie Davis, singer/songwriter Gladys Knight, Pastor Daryl Coley, and Philadelphia Eagles Quarterback Donovan McNabb. (Id.)

### B. Defendants' Publishing Business

Defendant Black Pearl, a growing and popular publishing company, is owned and operated by its President, Defendant Hurst. In addition to Legit Baller ("Legit Baller" or the "Book"), Black Pearl has published a number of books described by the company as "gritty and

sexy urban stories."  (Id., ¶ 21, Exh. B, excerpts from Black Pearl's website,

www.blackpearlbooks.com.)  These other publications have titles and corresponding descriptions

such as <u>Hustling Backwards</u> ("three partners in crime rise up the ranks from Project-Kids to

Street Dons"); <u>Sex A Baller</u> ("Myserious Luva has sexed them all!  Ball players, CEO's, Music

Stars – You name the baller, she's had them.  And more importantly, she's made them all pay . .

."); and <u>Crunk</u> ("Imagine a thug world divided by the Mason-Dixon line . . .").

     The majority of Black Pearl's publications are sold in urban areas such as Atlanta,

Baltimore, Washington, D.C., Chicago, Los Angeles, and New York (Hurst Aff., ¶ 3.), and are

distinctly aimed at African-Americans (Id., ¶ 2).  On average, Black Pearl initially distributes

between 3,000 and 5,000 copies of a particular book, and even if sales of a book are outstanding,

it is unlikely that Black Pearl would ever place more than 10,000 copies of any book into active

distribution.  (Id., ¶ 4.)

     Black Pearl's publications were highly criticized in a recent <u>New York Times</u> editorial by

Nick Chiles, an African-American journalist.  Chiles' article, entitled "Their Eyes Were Reading

Smut," singled out <u>Legit Baller</u> as a prime example of "crass," "tasteless," "smut" that glorifies

the stereotyped African-American criminal.  (Dorsey Aff., Exh. C, "Their Eyes Were Reading

Smut.")

     Black Pearl presently faces significant financial hardship.  The majority of the company's

profits for 2005 were reinvested into Black Pearl's operations for the 2006 fiscal year.  (Hurst

Aff., ¶ 7.)  Black Pearl currently operates at a financial loss, in part, because the Borders Group

has terminated its business relationship with the company.  (Id., ¶¶ 8-9.)

C.      **Photographs At Issue**

In or about December 2004, Plaintiff contends he hired Defendant Damion Miller, a Maryland-based photographer, to take photographs of him during a private photo session. (Dorsey Aff., ¶ 23.)  According to Plaintiff, Miller's photographs were intended for Plaintiff's promotional and personal use.  (Id.)  Defendants contend, to the contrary, that Miller was contacted by Kenny Flanagan, the CEO of Kas Collection, Inc., a clothing company, to shoot a spread for the Kas Collection, using Plaintiff as a model.  (Miller Aff., ¶ 4.)  Miller set up several shots, photographing Plaintiff in different outfits, in different locations, and with different models.  (Id., ¶¶ 5-7; Dorsey Aff., ¶ 23.)  According to Miller, Flanagan paid him approximately $150 for the photo shoot.  (Miller Aff., ¶ 8.)

Plaintiff contends that although there was no formal written agreement between Plaintiff and Miller, Miller understood and orally agreed that Plaintiff owned and had the right to control all images taken at the December 2004 photo shoot, and that Miller would not make use of the images for his own benefit or for anyone else's.  (Id.)  Miller denies that there was ever such an understanding or oral agreement.  (Miller Aff., ¶ 7.)  Miller contends that Flanagan provided him with a written release, granting him the use of the photos of Plaintiff for Miller's "advertising purposes or personal use."  (Id., ¶ 8, Exh. A, Written release for use of the Dorsey photos.)  Miller claims he believed that Flanagan had full rights in the photographs, and that the written release he obtained from Flanagan granted him all rights in the images he had shot of Plaintiff.  (Id., ¶¶ 8-9.)

According to Plaintiff, Miller printed and turned over several hundred photographs from the December 2004 shoot to Plaintiff, including two images now appearing on the front and back

covers of Legit Baller.  (Dorsey Aff., ¶ 24; see also Pl.'s Br. at 3 (Book's front cover) and Pl.'s

Br. at 7 (Book's back cover).)  Plaintiff contends that he was particularly dissatisfied with the

photograph that appears on the front cover of Legit Baller, and that he had determined not to use

or publically release that image to anyone "long before" he commenced this action.  (Dorsey

Aff., ¶ 24.)

       **D.**     **Defendants' Use Of The Photographs At Issue**

In early 2004, Hurst scoured the Internet in search of photographs Black Pearl could use

on the cover of Legit Baller, and came across two pictures of a "good looking" African-American

man taken by Miller.  (Hurst Aff., ¶ 14, Exh. E, Photos of Dorsey from website.)  Hurst contends

that after communicating and negotiating with Miller and ensuring that Miller had the proper

authority and rights to the photographs, Black Pearl purchased a license from Miller, which it

claims grants the publisher the right to use the photographs.  (Hurst Aff., ¶¶ 15, 17, Exh. C,

License Agreement.)

Plaintiff maintains that he never authorized Black Pearl, Hurst, or anyone else to use his

likeness in connection with the Book.  (Dorsey Aff., ¶ 4.)  Nonetheless, Plaintiff contends that in

mid-May 2006, his colleagues and fans began telling him that they had seen his photograph on

the cover of a book entitled Legit Baller, and asking why he would associate himself with that

kind of work.  (Id., ¶ 25.)  Tipped off by such comments, Plaintiff located the Book, and

discovered that Black Pearl had obtained Miller's photographs and displayed his image

prominently on the Book's front and back covers.  (Id.)

Plaintiff also contends that after further investigation, he discovered that Black Pearl had

used the photograph that appears on the front cover of Legit Baller in connection with its

advertising and promotion of the Book.  Plaintiff found his image displayed in Black Pearl's advertising pamphlets, and on its website, www.blackpearlbooks.com.  (Id., ¶ 26, Figure 3; Id., Exh. D (Legit Baller advertisement).)

Plaintiff contends that his image, as displayed on the Book's cover, was disseminated to millions of people nationally, through its display at retail establishments such as Wal-Mart and Barnes & Noble, and via the Internet on Amazon.com.  (Id., ¶ 28, Figure 4.)  According to Defendants, upon its release in July 2005, Legit Baller failed to meet Black Pearl's sales expectations and has yet to sell its initial distribution of several thousand copies completely. Approximately four thousand copies of Legit Baller remain in Black Pearl's warehouse, and Defendants have no intent to distribute them.  (Hurst Aff., ¶¶ 19-20.)

After learning that Black Pearl was using and disseminating his image, Plaintiff's associate contacted Miller, and during their conversation, Miller admitted that he had licensed two images of Plaintiff to Black Pearl.  (Dorsey Aff., ¶ 29.)

Plaintiff thereafter obtained legal counsel, and through counsel, wrote to Black Pearl demanding that it cease and desist using the images it had obtained from Miller.  (Id., ¶ 31, Exh. F (cease and desist letter).)  In this letter, Plaintiff's counsel explained that Plaintiff is a celebrity who had never consented to the use of his likelihood in connection with Legit Baller.  (Id.)  Black Pearl responded in a letter authored by Felicia Hurst, denying any wrongdoing, and refusing to cease disseminating Plaintiff's image in connection with the Book.  (Id., ¶ 31, Exh. G, Response to cease and desist letter.)  Black Pearl and Hurst contend that they were not aware of Plaintiff's identity until they received the cease-and-desist letter.  (Hurst Aff., ¶¶ 16, 21.)

Recently, Black Pearl has ceased mailing and distributing copies of Legit Baller to the

8

retail market pending a decision by this Court.  (Id., ¶ 25.)  According to Plaintiff's counsel, however, Plaintiff's image was still being displayed on Black Pearl's website as of October 17, 2006.  (Coleman 2nd Cert., ¶ 2, Exh. A.)

>    **E.**    **Impact Of Defendants' Use Of Plaintiff's Image On Plaintiff**

Plaintiff contends that he continues to receive comments from both fans and business associates regarding his involvement with Legit Baller.  As late as August 2006, at the American Black Film Festival in Florida, at least a dozen people allegedly approached Plainitff to relay that they had seen him on the cover of the Book.  (Id., ¶¶ 9; 34-36.)[3]  Plaintiff asserts that the first question asked by  nearly every individual who has approached him about his photograph on the Book was why he would associate himself with the publication.  (Id.)  Plaintiff contends that as a result of having to spend a significant amount of time fielding questions about his involvement with the Book so that he could explain that he had nothing to do with the publication, Plaintiff's ability to network and promote himself at the Film Festival was hampered.  (Id.)

Additionally, Plaintiff contends that Defendants' use of his likeness in connection with Legit Baller has jeopardized at least one of his endorsement deals with Cadbury, the compensation for which could exceed six figures in value.  (Id., ¶ 38.)  Plaintiff asserts that once the marketing representative for Cadbury became aware of Plaintiff's presence on the cover of Legit Baller, Plaintiff was informed that the presence of his image on the Book posed a problem for Cadbury's image.  Cadbury purportedly indicated that the representation of Plaintiff on the

---

[3]The American Black Film Festival is a five-day international film convention that provides, among other things, a forum for those interested in the film and entertainment industries to network, view upcoming films, and promote themselves and their products and services.  (Id., ¶ 9.)

Book as a drug dealer and felon is contrary to the message Cadbury wanted Plaintiff to convey to child-consumers of Cadbury products.  (Id.)  At the time Plaintiff filed his motion, Cadbury had not consummated its deal with Plaintiff, and all negotiations regarding the potential endorsement deal had stalled.  (Id.)

## II.  DISCUSSION

### A.  Legal Standard Governing Preliminary Injunctions

"'[A] district court may permissibly grant the 'extraordinary remedy' of a preliminary injunction only if '(1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest.'"  P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC, 428 F.3d 504, 508 (3d Cir. 2005) (quoting Nutrasweet Co. v. Vit-Mar Enterprises, 176 F.3d 151, 153 (3d Cir. 1999) (quoting Maldonado v. Houstoun, 157 F.3d 179, 184 (3d Cir.1998))).  "The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate."  Id. (citing Nutrasweet, 176 F.3d at 153).

### B.  Likelihood Of Success On The Merits

#### 1.  *Whether Plaintiff Is Likely To Succeed On His Lanham Act Claim*

Under the Lanham Act § 43(a)(1)(A), 15 U.S.C. § 1125(a),

(1) any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which
    (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services,

or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Thus, to prevail on his Lanham Act claim, Plaintiff must establish that: "(1) the mark is valid and legally protectable; (2) the mark is owned by the [P]laintiff; and (3) the [D]efendant[s]' use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services." Fisons Horticulture, Inc. v. Vigoro Industries, Inc., 30 F.3d 466, 472 (3d Cir. 1994); A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000).

### a.      Validity, Protectability, And Ownership Of The Mark[4]

The "mark" at issue in this case is Plaintiff's likeness.  In essence, Plaintiff's Lanham Act claim contends that Defendants used his likeness without his authorization in a manner likely to confuse consumers as to his sponsorship or approval of Legit Baller, and Black Pearl's publications generally.  "A false endorsement claim based on the unauthorized use of a celebrity's identity . . . alleges the misuse of a trademark, i.e., a symbol or device such as a visual likeness, vocal imitation, or other uniquely distinguishing characteristic, which is likely to confuse consumers as to the plaintiff's sponsorship or approval of the product." Waits v. Frito-Lay, Inc., 978 F.2d 1093, 1110 (9th Cir. 1992); see also McBee v. Delica Co., Ltd., 417 F.3d 107, 115 (1st Cir. 2005); Landham v. Lewis Galoob Toys, Inc., 227 F.3d 619, 626 (6th Cir. 2000); Wendt v. Host Intern., Inc.,  125 F.3d 806, 812 (9th Cir. 1997).  Thus, in a false endorsement claim, such as the one at issue in this case, the Plaintiff-celebrity owns a valid, protectable mark in his own

_____

[4]Defendants do not challenge that Plaintiff owns a valid, protectable, trademark in his likeness.

likeness.  Plaintiff is therefore likely to succeed in establishing that he owns a valid, protectable mark in his likeness.

**b.      Likelihood Of Confusion**

The Third Circuit, in <u>Scott Paper Co. v. Scott's Liquid Gold, Inc.</u>, 589 F.2d 1225 (3d Cir. 1978), set forth the following non-exhaustive list of ten factors to be considered by district courts in evaluating the likelihood of confusion by consumers: (1) the degree of similarity between the owner's mark and the allegedly infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; and (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market."  <u>Id.</u> at 1229; <u>A & H Sportswear</u>, 237 F.3d at 211; <u>Interpace Corp. v. Lapp, Inc.</u>, 721 F.2d 460, 463 (3d Cir. 1983).

In addressing trademark claims involving celebrity false endorsement claims, the Ninth Circuit has suggested a modified set of factors for courts to consider in determining whether Plaintiff has demonstrated a likelihood of confusion in celebrity cases.  These factors are: "(1) the level of recognition that the plaintiff has among the segment of the society for whom the defendant's product is intended; (2) the relatedness of the fame or success of the plaintiff to the

defendant's product; (3) the similarity of the likeness used by the defendant to the actual plaintiff; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent on selecting the plaintiff; and (8) likelihood of expansion of the product lines." Downing v. Abercrombie & Fitch, 265 F.3d 994, 1007-1008 (9th Cir. 2001). See also McBee v. Delica Co., Ltd., No. 02-198-P-C, 2004 WL 2634465, at *11 (D. Me. Aug. 19, 2004) (adopting the Downing factors in a celebrity trademark case).

The Third Circuit has underscored in discussing its ten-factor inquiry, that no single factor is determinative, although the degree of similarity is the most important factor in determining a likelihood of confusion. Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 709, 712 (3d Cir. 2004). As the Third Circuit noted in Fisons Horticulture, "[t]he weight given to each factor in the overall picture, as well as its weighting for plaintiff or defendant, must be done on an individual fact-specific basis . . . We have emphasized the importance of similarity of the marks in likelihood of confusion, but we have not ranked the factors otherwise." Fisons Horticulture, 30 F.3d at 476 n.11 (citing Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 293 (3d Cir. 1991)). Not every factor is relevant in all cases. Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc., 269 F.3d 270, 280 (3d Cir. 2001).

Given the peculiar nature of celebrity false endorsement cases, and the Third Circuit's acknowledgment that its factors are not determinative, all-inclusive, or wholly relevant in every case, this Court finds that the factors set forth by the Ninth Circuit in Downing are the appropriate considerations for this Court in determining whether Plaintiff will likely establish his

Lanham Act claim.[5]

       **(i)**     ***Recognition Of Plaintiff Among The Segment Of Society***

                  ***For Whom The Book Is Intended***

The first <u>Downing</u> factor is the recognition of plaintiff among the segment of society for whom the Book is intended.  This Court finds that <u>Legit Baller</u> is undoubtedly targeted at the African-American community by virtue of its cover, which depicts an African-American male, and its content, which Black Pearl represents as a "gritty and sexy urban stor[y]" about an African-American male entwined in drugs and "gangsta" culture.  (Hurst Aff., ¶ 2; Dorsey Aff., ¶ 21, Exh. B, excerpts from Black Pearl's website, www.blackpearlbooks.com.)

Plaintiff, as an R&B artist, has proffered evidence demonstrating that he has been nominated for two Grammy awards; has had his likeness and/or name distributed on millions of record and film copies to which he has made an artistic contribution; and has been actively involved in community outreach activities aimed at African-American inner-city youths.  (Dorsey Aff., ¶¶ 13-18.)  With this evidence illustrating his extensive involvement in R&B music and African-American films, such as those produced and directed by Spike Lee, as well as his urban community service, Plaintiff has demonstrated that he is likely to establish that he is recognizable in the African-American community – the same social segment at which Black Pearl has targeted <u>Legit Baller</u>.  <u>See, e.g.</u>, <u>Downing</u>, 265 F.3d at 1008 ("it is undisputed that Appellants are legendary surfers, and thus there is a reasonable inference that Appellants would be known to the

_____

[5]This Court notes that the <u>A & H Sportswear</u> factors are not in conflict with the <u>Downing</u> factors.  This Court further notes that even if it were to apply the <u>A & H Sportswear</u> factors, it would still find that Plaintiff has established that it is likely he will ultimately establish a likelihood of success on the merits of his Lanham Act claim.

young people to whom the Quarterly is directed and who would be purchasing Abercrombie's surf wear"). Defendants have proffered no evidence to the contrary.[6] The first factor therefore weighs in favor of granting Plaintiff's motion.

### (ii)    *Relatedness Of Plaintiff's Fame Or Success To The Book*

As respects the second factor, this Court finds that there is no evidence that Plaintiff's fame or success in the music industry or as a philanthropist has any relationship to the content of Legit Baller, which is a fictitious urban story about a gangster and drug-dealer.  In fact, all arguments proffered by Plaintiff stress that he and his work and accomplishments are completely separate from, and unrelated to, the themes and content of the Book.  This factor weighs against Plaintiff.

### (iii)    *Similarity Of The Likeness Used By The Defendant To The Actual Plaintiff*

The images Defendants have displayed in connection with Legit Baller are photographs of the Plaintiff, and are thus exact replicas of his likeness.  (Dorsey Aff., ¶ 24; see also Pl.'s Br. at 3 (Book's front cover) and Pl.'s Br. at 7 (Book's back cover).)  Therefore, the third Downing factor – the similarity of the likeness used by the defendant to the actual plaintiff – clearly weighs in Plaintiff's favor.

---

[6]In their papers and at oral argument, Defendants made sweeping arguments that Plaintiff is not recognizable in the African-American community, and that if they were to poll people on the street, none of them would recognize Plaintiff.  Defendants, however, while given ample opportunity, have failed to proffer any evidence indicating that their arguments hold water.  This Court cannot and will not consider Defendants' arguments as evidence.  Defendants' arguments does not contravene the evidence that Plaintiff has proffered, which indicates that he is recognized in the African-American community.

### (iv)   *Evidence Of Actual Confusion*

Plaintiff has proffered evidence of actual confusion, the fourth factor, in the form of questions directed at him by fans and colleagues regarding his apparent sponsorship of the Book, as well as the halting of negotiations of an endorsement deal upon discovery of his likeness on the Book.  (Dorsey Aff., ¶¶ 9, 25, 34-36, 38.)  This evidence of actual confusion provides strong support for Plaintiff's motion.[7]

### (v)   *Marketing Channels Used By Plaintiff And Defendants*

The fifth factor weighs neither for nor against a finding that Plaintiff will likely establish a likelihood of confusion.  While Plaintiff argues that his work is available at some of the same outlets where the Book is sold, Plaintiff provides no evidence in support of that argument.  Accordingly, this Court cannot determine whether Plaintiff and Defendants use the same marketing channels.  The fifth factor, therefore, is neutral.

### (vi)   *Likely Degree Of Purchaser Care*

The sixth factor – the likely degree of purchaser care – is similarly unsupported by evidence; neither party has presented any argument or evidence regarding this factor.  It is

---

[7]Contrary to Defendants' argument at the hearing on Plaintiff's motion, Plaintiff has no affirmative duty to present the Court with evidence of a myriad of instances of confusion in order to prevail on his motion.  Evidence of actual confusion is one factor among many for the Court to consider in determining whether Plaintiff has established a likelihood of confusion.  Evidence of even one instance of actual confusion is significant to the Court's inquiry.  See Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center, 109 F.3d 275, 284-285 (6th Cir. 1997) (finding one instance of actual confusion significant because, "[b]earing in mind that a successful Lanham Act plaintiff only must show a sufficient potential of confusion, not actual confusion, the fact that some confusion already has occurred favors plaintiff at least to some extent"); World Carpets, Inc. v. Dick Littrell's New World Carpets, 438 F.2d 482, 489 (5th Cir. 1971) (given the difficulty of proving actual confusion, relatively little showing on the part of the plaintiffs is required).

therefore a neutral factor.

### (vii)  *Defendants' Intent*

As respects the seventh factor – Defendants' intent – Plaintiff has proffered evidence that once apprised that they were using Plaintiff's images on their Book, Defendants continued to do so.  (Dorsey Aff., ¶ 31, Exhs. F and G; Coleman 2nd Cert., ¶ 2, Exh. A.)  Thus, while Defendants have proffered evidence that they did not know who Plaintiff was when they decided to use his image in connection with <u>Legit Baller</u> (Hurst Aff., ¶¶ 16, 21), uncontroverted evidence clearly shows that they continued to distribute and post his image even after they were made aware of their allegedly infringing use (Dorsey Aff., ¶ 31, Exh. G, Response to cease and desist letter; Coleman 2nd Cert., ¶ 2, Exh. A).  Therefore, the seventh factor weighs in Plaintiff's favor.

### (viii)  *Likelihood of Expansion Of The Product Lines*

The eighth <u>Downing</u> factor – likelihood of expansion of the product lines – likely will weigh in favor of finding a likelihood of confusion as well.  While the evidence indicates that Plaintiff has not capitalized on his image thus far (Dorsey Aff., ¶ 17), the evidence also indicates that Plaintiff has been planning to disseminate his image for profit in connection with endorsement deals (Id., ¶ 38).  Additionally, based on his past continuous involvement in the music industry (Dorsey Aff., ¶¶ 13-17), it can be inferred that Plaintiff will continue to produce and create, and expand his involvement in that field.

### (ix)  *Evaluation Of The Factors*

This Court has found it is likely that five of the <u>Downing</u> factors will weigh in favor of a finding of likelihood of confusion, one will weigh against such a finding, and two are neutral.  As noted earlier, however, the factors should not be applied mechanistically, but rather  as a guide in

assessing likelihood of confusion.  See Kos, 369 F.3d at 709, 712; Fisons Horticulture, 30 F.3d at 476 n. 11.  "The weight given to each factor in the overall picture, as well as its weighting for plaintiff or defendant, must be done on an individual fact-specific basis."  Id.  Viewing the evidence in this light, this Court finds that Plaintiff probably will be able to establish a likelihood of confusion.  Of the five factors favoring a likely finding of likelihood of confusion, one is that the marks are similar.  The Third Circuit has found that this factor is accorded more weight than the others.  Summit Motor Products, 930 F.2d at 293; Fisons Horticulture, 30 F.3d at 476 n. 11.

Another of the factors favoring a finding of likelihood of confusion is evidence of actual confusion.  These two factors strongly indicate that it is likely that Plaintiff will be able to establish a likelihood of confusion, and therefore succeed on the merits of his Lanham Act claim. The only factor weighing against Plaintiff – the relatedness of his fame and celebrity to the product – does not counteract the heavy weight this Court accords the similarity of the marks and the evidence of actual confusion proffered by Plaintiff.

In sum, this Court finds that given that the majority of factors favoring Plaintiff, including similarity and actual evidence of confusion, Plaintiff has successfully demonstrated that he likely will establish that there is a likelihood of consumer confusion as a result of Defendants' use of his likeness in connection with Legit Baller.

### c.    Lanham Act Conclusion

This Court finds that Plaintiff is likely to succeed on the merits of his Lanham Act claim; Plaintiff has established that he will likely prove that he owns a valid, protectable trademark in his likeness, and that Defendants' use of his likeness is likely to cause confusion as to whether he

has endorsed or otherwise supported <u>Legit Baller</u>.[8]

**2.      _Whether Plaintiff Is Likely To Succeed On The Merits Of His_**

**_Misappropriation / Right Of Publicity Claim_**

Plaintiff also contends that the requested preliminary injunctive relief should be issued because he is likely to succeed on the merits of his misappropriation/right of publicity claim under New Jersey law.  "The right of publicity signifies the right of an individual, especially a public figure or celebrity, to control the commercial value and exploitation of his name and picture or likeness and to prevent others from unfairly appropriating this value for commercial benefit."  <u>McFarland v. Miller</u>, 14 F.3d 912, 918 (3d Cir. 1994) (citations omitted); <u>see also</u> <u>Jarvis v. A & M Records</u>, 827 F.Supp. 282, 297 (D.N.J. 1993) ( "The right of publicity generally applies to situations where the plaintiff's name, reputation or accomplishments are highly

---

[8]This Court notes that Defendants, without making an express argument, infer that the license agreement they entered into with Miller precludes their liability under the Lanham Act. While Miller did license Defendants to use Plaintiff's photographs for commercial gain, the evidence indicates that Miller did not have the authority to transfer such rights in the photographs.  (See Hurst Aff., Exh. C, License Agreement; Id., Exh. A, Written release for use of the Dorsey photos.)  Instead, Miller had obtained the right to use Plaintiff's image solely for his own "advertising purposes or personal use."  (Id., ¶ 8, Exh. A, Written release for use of the Dorsey photos.)  There is no evidence in the record indicating that Plaintiff ever gave Miller or Flanagan permission to reproduce his image.  Contrary to Defendants' arguments at the hearing on Plaintiff's motion, Plaintiff had no duty to forge written agreements to protect against the dissemination of his image.

That Black Pearl and Hurst may have acted in good faith under the mistaken belief that they had acquired rights in the photographs, does not preclude them from being held liable for violations of the Lanham Act.  There is no requirement that Defendants' conduct be intentionally in violation of established law.  <u>See</u> <u>Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.</u>, 799 F.2d 867, 875 (2d Cir. 1986) ("intentional copying is not a requirement under the Lanham Act"); <u>Federated Mut. Ins. Co. v. Power Lift</u>, D.C. No. CV-95-03246-RSWL, 1998 WL 385136, at *1 (9th Cir. June 22, 1998) (Unpub. Disp.) ("intentional wrongdoing is not a necessary element of a trademark infringement claim").

publicized and the defendant used that fact to his or her advantage"); <u>Estate of Presley v. Russen</u>, 513 F. Supp. 1339, 1354 (D.N.J. 1981) (citing <u>Edison v. Edison Polyform Mfg. Co.</u>, 73 N.J.Eq. 136, 67 A. 392 (1907)) (holding that an individual has a "right to prevent the unauthorized, commercial appropriation of his name or likeness"). "The theory underlying the right [of] publicity is that a celebrity has the right to capitalize on his persona, and the unauthorized use of that persona for commercial gain violates fundamental notions of fairness and deprives the celebrity of some economic value in his persona." <u>Prima v. Darden Restaurants, Inc.</u>, 78 F. Supp.2d 337, 349 (D.N.J. 2000) (citing <u>McFarland</u>, 14 F.3d at 919 (quoting <u>Palmer v. Schonhorn Enters., Inc.</u>, 96 N.J. Super. 72, 79 (1967))). Particularly in today's society, where celebrity status translates to economic wealth, "unauthorized use harms the person both by diluting the value of the name [or likeness] and depriving that individual of compensation." <u>See</u> <u>McFarland</u>, 14 F.3d at 919. "Unauthorized use of an individual's name is nothing short of 'an appropriation of the attributes of one's identity.'" <u>Id.</u> (quoting <u>Motschenbacher v. R.J. Reynolds Tobacco Co.</u>, 498 F.2d 821, 824 (9th Cir. 1974)).

Thus, to establish that he is likely to prevail on his misappropriation/right of publicity claim, Plaintiff must show that it is likely he will be able to demonstrate by a preponderance of the evidence that Defendants have used his likeness for commercial gain in a manner that has deprived him of some economic value in his persona.

Plaintiff has established that it is likely he will prove Defendants are using his likeliness for commercial gain with evidence indicating that they have placed his photograph, i.e., his exact likeness, on the cover of <u>Legit Baller</u> (front and back), as well as materials advertising and selling the Book, which has been widely offered for sale in both retail outlets and on the Internet.

(Dorsey Aff., ¶¶ 24, 28; see also Pl.'s Br. at 3 (Book's front cover) and Pl.'s Br. at 7 (Book's back cover).)   See, e.g., Grant v. Esquire, Inc., 367 F. Supp. 876, 881 (S.D.N.Y. 1973) (finding the unauthorized use of a photo of Cary Grant in a fashion article violative of Plaintiff's right of publicity); Ali v. Playgirl, Inc., 447 F. Supp. 723, 727, 728-29 (S.D.N.Y. 1978) (unauthorized drawing of nude man, recognizable as Muhammed Ali, seated in corner of boxing ring was violative of Ali's right of publicity).  Plaintiff has established a likelihood that he will succeed on the merits of his misappropriation/right of publicity claim,.

### C.   **Irreparable Harm**

As this Court has explained, to prevail on his motion for a preliminary injunction, Plaintiff must also establish that he will be irreparably harmed if the requested relief is not granted.  See P.C. Yonkers, 428 F.3d at 508.  Where a party demonstrates a likelihood of success on a trademark infringement claim, irreparable harm is presumed, because a "lack of control over one's own mark amounts to irreparable harm."  Times Mirror Magazines, Inc. v. Las Vegas Sports, 212 F.3d 157, 169 (3d Cir. 2000), cert. denied, 531 U.S. 1071 (2001).  See also S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 378 (3d Cir. 1992) ("trademark infringement amounts to irreparable injury as a matter of law"); Genessee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 142 (2d Cir. 1997) (holding that this was true for an unregistered trademark and stating that a "showing of likelihood of confusion (a requirement of both trademark infringement and unfair competition claims) establishes irreparable harm"); International Jensen, Inc v. Metrosound U.S.A., Inc., 4 F.3d 819, 826 (9th Cir. 1993) ("In trademark cases, once the plaintiff establishes a likelihood of confusion between the plaintiff's mark and the defendant's, it is ordinarily presumed the plaintiff will suffer irreparable harm if injunctive

21

relief is not granted").

Here, because Plaintiff has demonstrated a likelihood of success on the merits of his Lanham Act claim, it is presumed that he will suffer irreparable harm if injunctive relief is not granted.

### D.   **Balancing Of The Hardships**

This Court cannot issue a preliminary injunction if doing so will result in irreparable harm to the Defendant.  P.C. Yonkers, Inc., 428 F.3d at 508.  Here, Plaintiff has requested two separate orders: (1) an order enjoining Defendants from "continuing to publish and distribute or otherwise exploit Legit Baller in its current form, which prominently and recognizably bears Mr. Dorsey's likeness on the front and back covers, or otherwise exploit any other books or advertising or promotional materials that contain Mr. Dorsey's likeness" (Pl.'s Br. at 2.); and (2) an order requiring Defendants to recall the Book, and any other books or materials containing Mr. Dorsey's likeness, from bookstores and other commercial and retail outlets throughout the United States.  Accordingly, this Court must evaluate the harm to Defendants that would result if either order is issued.

#### 1.   *Injunction Preventing The Continued Publication and Distribution of Legit Baller And Any Other Materials Containing Dorsey's Likeness*

Defendants have failed to proffer any evidence demonstrating that they will suffer significant harm if this Court issues an order enjoining their continued publication and distribution of products and materials containing Plaintiff's image.[9]  Defendants indicate that

---

[9]At oral argument, Defendants made unsupported allegations that they would be irreparably harmed if any injunctive relief is granted.  These unsupported allegations of irreparable harm are insufficient to tip the balance of the hardships in Defendants' favor.

they have already made efforts to cease continued publication, distribution, and web advertisements of <u>Legit Baller</u> (Hurst Aff., ¶¶ 22, 25.), and have indicated that because of <u>Legit Baller</u>'s poor sales, they have no plans to distribute copies of the Book currently housed in the company's storage facility.  (Hurst Aff., ¶¶ 19-20.)  These actions and statements by Defendants indicate that entering an order directing them to cease distributing Plaintiffs' image will not cause them irreparable harm.  Because Plaintiff has established that he will be irreparably harmed if an injunction halting further distribution of his image is not issued, in the absence of any evidence of irreparable harm to Defendants, the balance of the hardships tips sharply in Plaintiff's favor, and supports granting Plaintiff's motion for a preliminary injunction enjoining Defendants from distributing Plaintiff's image.

## 2. *Recall Order*

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  <u>University of Texas v. Camenisch</u>, 451 U.S. 390, 395 (1981); <u>St. Thomas-St. John Hotel & Tourism Ass'n. Inc. v. Government of U.S. Virgin Islands ex rel. Virgin Islands Dept. of Labor</u>, 357 F.3d 297, 301 (3d Cir. 2004).  "[W]hen the preliminary injunction is directed not merely at preserving the status quo but, as [with the case of a recall], at providing mandatory relief, the burden on the moving party is particularly heavy."  <u>Punnett v. Carter</u>, 621 F.2d 578, 582 (3d Cir. 1980) (citing <u>United States v. Spectro Foods Corp.</u>, 544 F.2d 1175, 1181 (3d Cir. 1976)).  In other words, because mandatory preliminary injunctions disturb, rather than preserve the status quo, they are particularly disfavored, and should not issue unless the facts and law clearly favor the moving party.  <u>Martinez v. Matthews</u>, 544 F.2d 1233, 1243 (5th Cir. 1976); <u>Anderson v. United States</u>, 612 F.2d 1112 (9th Cir. 1979).

While it is well settled that this Court's equity jurisdiction empowers it to mold each injunctive decree to the necessities of the particular case, Hect Co. v. Bowles, 321 U.S. 321, 329 (1944), ". . . a district court should carefully consider the likely burden and expense of a recall before it imposes the remedy.  In some circumstances the imposition of a recall may be unduly onerous, as where the defendant's products are widely distributed and particularly expensive to ship.  Or the probable benefit to the plaintiff from a recall may not outweigh the burden to the defendant in some cases even if that burden is relatively light." Perfect Fit Industries v. Acme Quilting Co., 646 F.2d 800, 807 (2d Cir. 1981).

This Court finds that a broad recall is not an appropriate remedy to impose on Defendants at this time.  Defendants have proffered evidence that a recall of all books and materials containing Plaintiff's image would force Black Pearl, which is already operating at a loss, to dissolve.  In Hurst's sworn statement, she declares that because of Black Pearl's current dispute with Borders, the books currently in circulation are the company's only source of revenue. (Hurst Aff., ¶ 23.)  Hurst further testifies that a recall order would force Black Pearl and Hurst to shut down all operations and dissolve the company.  (Hurst Aff., ¶ 24.)

While the images of Plaintiff on Defendants' products and advertisements are presumptively causing Plaintiff irreparable harm, to the extent that Legit Baller is advertised in the back pages of other books, which have already been distributed by Black Pearl, the images of Plaintiff in or on those publications are small and dwarfed by other images and the text of the books.  (Hurst Aff., ¶¶ 3, 19-20.)  There is a presumption that Plaintiff will suffer irreparable harm if his likeness remains in the marketplace attached to Defendants' publications and advertisements.  Nonetheless, because the harm Defendants would suffer if a broad recall is

24

ordered is so extreme, i.e., because a broad recall of all of Black Pearl's books would likely cause Black Pearl to fold (Hurst Aff., ¶¶ 23-24), this Court finds that the balance of the hardships tips in Defendants' favor regarding Plaintiff's request for an order mandating a recall of all books containing Dorsey's image.

This Court finds, however, that an order directing that all copies of <u>Legit Baller</u>, which prominently and obviously displays Plaintiff's face, be recalled is appropriate under the circumstances present here. The damage presumptively caused to Plaintiff through the dissemination of <u>Legit Baller</u>, as opposed to through advertisements of <u>Legit Baller</u> placed on the back pages of other titles, is significant. Additionally, there are only a few thousand copies of <u>Legit Baller</u> in circulation in limited geographic areas (Hurst Aff., ¶¶ 3, 19), and a recall order mandating that <u>Legit Baller</u> be removed from shelves would not affect Defendants' ability to continue to sell other titles currently in circulation. Defendants have failed to proffer any evidence indicating that a recall limited to <u>Legit Baller</u> would force it out of business. Based on the evidence before it, this Court finds that a balance of the hardships weighs in favor of granting a recall order limited to <u>Legit Baller</u>.

### E.    Public Interest

Before this Court can issue a preliminary injunction, it must also determine whether doing so is in the public interest. <u>See</u> <u>P.C. Yonkers</u>, 428 F.3d at 508. "Where a likelihood of confusion arises out of the concurrent use of a trademark, the infringer's use damages the public interest." <u>Jiffy Lube</u>, 968 F.2d at 379. Because Plaintiff has shown that he likely will establish a likelihood of consumer confusion, the public interest weighs in favor of granting Plaintiff's motion for a preliminary injunction.

F.   <u>Weighing The Equities</u>

Having considered the four factors of the preliminary injunction analysis, this Court determines that all factors favor granting injunctive relief to preserve the status quo, i.e., to halt further disbursement of Plaintiff's image by Defendants.  The balancing of the hardships factor, however, leads this Court to conclude that it cannot issue a broad recall order at this juncture. See <u>P.C. Yonkers</u>, 428 F.3d at 508 ("The burden lies with the plaintiff to establish *every element in its favor*, or the grant of a preliminary injunction is inappropriate") (emphasis added).  The factors, however, wholly support issuing a more limited recall order directing that all copies of <u>Legit Baller</u> be recalled from the marketplace.  This Court therefore finds that the equities favor granting Plaintiff's motion for an injunction ceasing further distribution of his image and a recall order limited to <u>Legit Baller</u>, and weigh against granting Plaintiff's motion for a broad recall order of all materials containing Plaintiff's image in any form.[10]

### III.  <u>CONCLUSION</u>

For the reasons stated above, this Court grants in part and denies in part Plaintiff's motion for a preliminary injunction.  This Court grants Plaintiff's motion for a preliminary injunction enjoining Defendants Black Pearl Books, Inc. and Felicia Hurst from continuing to publish and distribute or otherwise exploit the book <u>Legit Baller</u> in its current form, or otherwise publish,

---

[10]This Court emphasizes that Defendants have failed to argue or proffer any evidence that they will suffer irreparable harm if they are restrained from distributing all of their publications, which contain Plaintiff's image in whatever form – on the books' covers or in the books' back pages.  Defendants have, however, demonstrated that they will suffer significant irreparable harm if this Court enters a broad recall order, mandating that all books published by Black Pearl and containing Plaintiff's image, in whatever form, be recalled.  For these reasons, the balance of the hardships requires this Court to issue a recall order limited to <u>Legit Baller</u>, while at the same time issuing a status quo injunction restraining Defendants from any future dissemination of Plaintiffs' image, in whatever form.

distribute, or exploit any other books or advertising or promotional materials that contain Mr.

Dorsey's likeness.  This Court grants in part and denies in part Plaintiff's request for a recall

order, and issues a recall order directing that all copies of <u>Legit Baller</u> be recalled from the

marketplace.  This Court denies Plaintiff's request for a recall to the extent Plaintiff seeks to

recall all books containing Plaintiff's image.


Dated: November 14, 2006                                 _____s/ Joseph A. Greenaway, Jr._____
                                                         JOSEPH A. GREENAWAY, JR., U.S.D.J.